[No. 13613.   Department Two.   December 29, 1916.]

THE STATE OF WASHINGTON, *Respondent*, v.
PAUL R. HAFFER, *Appellant.*[1]

LIBEL AND SLANDER—CRIMINAL PROSECUTION—DEFAMATION OF DE-CEASED PERSON—MALICIOUS INTENT.  To constitute common law libel by publishing defamatory matter of any person deceased, malicious intention of the defendant to injure the family and posterity of the deceased must be expressly averred and proved.

SAME—DEFAMATION OF DECEASED PERSON—INJURY TO FAMILY—STATUTES—CONSTRUCTION.  Rem. & Bal. Code, § 2777, which defines criminal libel by defamation of a person deceased substantially as at common law, requiring that it tend to scandalize or provoke the deceased's surviving relatives or friends, having been superseded by Rem. Code, § 2424, making it libel "to expose the memory of one deceased to hatred, contempt, ridicule or obloquy," a clear legis-lative intent is manifested to eliminate the prior limitations as to injury to the deceased's relatives and friends; hence defamation of the memory of George Washington is libel under the latter section.

SAME.  Rem. Code, § 2424, making it libel to expose the "memory of one deceased" to hatred, contempt, or obloquy, is not restricted to the memory of a deceased existing in the minds of living persons, but applies as well to memory resting in tradition and history.

CONSTITUTIONAL LAW—FREEDOM OF SPEECH.  The provision of the Federal constitutional amendment that Congress shall make no law abridging the freedom of speech or of the press is only a limitation upon the power of Congress, and does not apply to state laws.

SAME—FREEDOM OF SPEECH—LIBEL.  Const., art. 1, § 5, providing that every person may freely speak or write on all subjects, "being responsible for the abuse of that right," does not give the right to maliciously defame the memory of a deceased person, or render void Rem. Code, § 2424, making such defamation criminal libel.

CRIMINAL LAW—APPEAL—HARMLESS ERROR.  A refusal of a mo-tion under Rem. Code, § 2101, to have an information "set aside" because it was not verified, is error without prejudice, where the court properly permitted an amended and verified information to be filed.

CRIMINAL LAW — FORMER JEOPARDY — "DISMISSAL" — STATUTES.  Rem. & Bal. Code, §§ 2124, 2125, providing that an order of "dis-missal" shall be a bar to another prosecution for the same offense

[1]Reported in 162 Pac. 45.

if it be a misdemeanor, has no reference to an order "setting aside" an information, provided for in Rem. Code, § 2101, in case it is not signed, or verified, etc.; but applies only to dismissals which take the place of the common law *nolle prosequi*.

CRIMINAL LAW—TRIAL—PRESENCE OF ACCUSED. Error cannot be predicated upon instructions to the jurors while the accused was absent from the court room, where the address was to all jurors in attendance on the court touching a matter foreign to the case.

Appeal from a judgment of the superior court for Pierce county, Card, J., entered May 18, 1916, upon a trial and conviction of libel. Affirmed.

*P. L. Pendleton* and *C. J. Criswell*, for appellant.

*Fred G. Remann*, *J. W. Selden*, and *Albert E. Joab*, for respondent.

PARKER, J.—The defendant, Haffer, was charged, by information filed in the superior court for Pierce county, with the offense of libel, in that, on the 18th day of February, 1916, he maliciously composed and published in a designated newspaper of general circulation in Pierce county an article tending to expose the memory of George Washington to hatred, contempt and obloquy. The trial of the defendant, had before the superior court sitting with a jury, resulted in a verdict of guilty. Judgment and sentence were accordingly rendered against him by the superior court, from which he has appealed to this court.

The offense charged against appellant and of which he was adjudged guilty is defined in our criminal code of 1909 as follows:

"Every malicious publication by writing, printing, picture, effigy, sign or otherwise than by mere speech, which shall tend: . . . (2) To expose the memory of one deceased to hatred, contempt, ridicule or obloquy; or (3) . . . shall be libel. Every person who publishes a libel shall be guilty of a gross misdemeanor." Laws 1909, p. 940, § 172; Rem. Code, § 2424.

It is conceded that the person concerning whom the alleged libelous article was composed and published is the George Washington who was the most prominent figure in our Revolutionary history, the first president of the United States, and who died in the year 1799. No contention is here made touching the libelous character of the article in question in so far as its language is concerned. We therefore give no consideration to the language of the article. Nor are the merits of the case before us in so far as the fact of the article being maliciously composed and published by appellant is concerned. That question was determined against him by the verdict of the jury, and no question is here raised as to the correctness of that determination. Indeed, that question could not be raised upon this record because the evidence is not before us so as to enable us to review it, even if counsel were so insisting.

The principal contention of counsel for appellant, as we understand them, is that the information does not charge facts constituting the offense of libel, in that no language published concerning a person who has been dead for a period reaching back to a time prior to the birth of any person living at the time of the publication is in law libelous and punishable as such; and that the courts must take judicial notice of the fact that Washington died before any person now living was born. We shall assume, for the purpose of argument, as we proceed, that Washington's death occurred before any person now living was born. We shall also assume, for the purpose of argument, that there is not now living in this state any relatives or posterity of Washington who could be injured or incited to breaches of the peace by the publication here involved. In support of counsel's contention upon this branch of the case, they invoke the common law conception of libel tending to defame the dead, and the limitation which it is claimed that law prescribed touching the intent of the publisher of the libelous language, and the period within which a deceased person can be libeled fol-

lowing his death so as to render the publisher of the libelous words subject to criminal prosecution. Let us first notice the libel of the common law, and the reasons thereof for its limitations here invoked touching the question of intent of the publisher and the presumption that only relatives and friends of the deceased could be injured or incited to breaches of the peace by such publications. We shall then be better able to understand whether or not there is in our new statutory definition of the offense, in so far as it relates to the defamation of the memory of deceased persons, a legislative intent to broaden the common law doctrine and do away with the limitations thereof here invoked by counsel for appellant.

In 3 Wharton's Criminal Law (11th ed.), §§ 1920 and 1921, we read:

"Writings vilifying the character of persons deceased are libels, and may be made the subject of an indictment; but the indictment in such a case must charge the libel to have been published with a design to bring contempt on the family of the deceased, or to stir up the hatred of the people against them, or to excite them to a breach of the peace, otherwise it cannot be sustained.

"But there should be a limit as to time. The Roman law here offers some salutary restrictions for our guidance. . . . A time arises when the interest of just historical criticism demand that the liberty of speech should be unrestrained; and when, even of the most illustrious of the dead, censures the most injurious must be permitted without penal amenability. The modern Roman law declares that this time arrives when the generation living at the death of the person libeled has passed away; . . ."

The learned author here, after defining the offense at common law showing that, in so far as the criminal intent is concerned, it must be an intent to "bring contempt on the family of the deceased, or to stir up the hatred of the people against them, or to excite them to a breach of the peace," seems to draw the conclusion that, at common law, there could be no prosecution for such a libel if it was published

after the generation living at the time of the death of the deceased had passed away, apparently upon the theory that the time had then arrived when no living person could be injured by the libelous publication, and hence when there could be no person to bring contempt upon, or to stir up hatred against, or to excite to a breach of the peace. It is interesting to note that this conclusion of the learned author seems to be rested rather more upon the civil than upon the common law.   In Newell on Slander and Libel (2d ed.), p. 965, that learned author says:

"It is a misdemeanor at common law, punishable on indictment with fine and imprisonment, to write and publish defamatory matter of any person deceased, provided it be published with malevolent purpose to injure his family and posterity, and to expose them to contempt and disgrace; for the chief reason of punishing offenses of this nature is their tendency to a breach of the peace.   And although the party be dead at the time of publishing the libel, yet it stirs up others of the same family, blood or society to revenge and to break the peace.   The malicious intention of the defendant to injure the family and posterity of deceased must be expressly averred and clearly proved."

In the leading case of *The King v. Topham*, 4 Durn. & East. Rep. 126, Lord Kenyon, having under consideration an alleged libelous publication reflecting on the memory of the late Earl Cowper, said:

"Now to say, in general, that the conduct of a dead person can at no time be canvassed; to hold that, even after ages are passed, the conduct of bad men cannot be contrasted with the good, would be to exclude the most useful part of history.   And therefore it must be allowed that such publications may be made fairly and honestly.   But let this be done whenever it may, whether soon or late after the death of the party, if it be done with a malevolent purpose to vilify the memory of the deceased, and with a view to injure his posterity, as in *R. v. Critchley*, then it comes within the rule stated by *Hawkins;* then it is done with a design to break the peace, and then it becomes illegal.   But on that question the jury ought to have had the power to deliberate;  . . ."

Prior to the enactment of our criminal code of 1909 de-
fining libel of this character in the language above quoted
from Rem. Code, § 2424, our statute defined such libel as fol-
lows:

"A libel is the defamation of a person made public by any
words, printing, writing, sign, picture, representation, or ef-
figy tending to  .  .  .; or any defamation, made public as
aforesaid, designed to blacken and vilify the memory of one
who is dead, and tending to scandalize or provoke his sur-
viving relatives or friends.  .  .  ." Laws 1891, p. 119;
Rem. & Bal. Code, § 2777.

Here we have in substance the common law definition of
such libel.  That is, the publication was required to be one
designed to "blacken and vilify the memory of one who is
dead," and also one "tending to scandalize or provoke his sur-
viving relatives or friends"; from which it might well have
been argued, as is done by counsel for appellant, that there
could be no surviving relatives or friends to be injured by
the publication of libelous language concerning the deceased
when such period had elapsed after the death of the de-
ceased that there would be no surviving relatives or friends
of the deceased. Now this former statutory definition of libel
of this character, which as we have seen was, in substance,
the common law definition, was the law existing and presuma-
bly known to the legislature when it passed the criminal code
of 1909 containing this new definition of the offense in the
language of § 2424, above quoted, which new definition elim-
inates all reference to the effect of the publication upon rela-
tives or friends of the deceased or any other designated class
of persons as an element of the defined offense, and which de-
clares in unqualified terms such language maliciously published
tending "to expose the memory of one deceased to hatred,
contempt, ridicule or obloquy" to be libel.  It seems to us
that the later enactment of § 2424, in view of the then state
of the law, evidences a clear legislative intention to eliminate
prior limitations of the law touching the publisher's intent

and the injury to living relatives and friends of the deceased as an element of the offense. So we conclude that the reasons of the common law are no longer controlling, and that, under this new statutory definition of the offense, it is not a question of whether the memory of the deceased is defamed to the injury of his living relatives and friends to the end that they be not provoked to breaches of the peace, but it is simply a question of whether or not the libelous publications tended "to expose the memory of one deceased to hatred, contempt, ridicule or obloquy." If such is the tendency of this publication and it was maliciously made, we see no escape from the conclusion that the act was an offense within the meaning of this new statute. If it be necessary to look for a reason prompting the legislature to thus broaden the definition of the offense, we may well presume that it can be found in the conclusion of the legislature, which clearly is within the bounds of reason, that all publications tending to defame the memory of deceased persons might have the tendency to excite some persons to breaches of the peace whether they be relatives or friends of the deceased or others who may have a high regard for the deceased, though such regard rest only upon traditional or historical knowledge.

Some contention is made that the word "memory," as used in § 2424, above quoted, defining the offense of which appellant was convicted, means only the memory of a deceased person existing in the minds of living persons without the aid of and apart from tradition and history, and that, therefore, the memory of Washington is not the "memory of one deceased" mentioned in § 2424. We are unable to agree with this contention. The word "memory," as used in that section, we think, is that which is defined in the Standard Dictionary as follows:

"The state of being remembered, a living continuously in the minds of men; posthumous fame; commemoration, as, the *memory* of Washington will endure."

We are of the opinion, therefore, that the words "memory of one deceased," as used in that section, means the memory of a person existing in the minds of the living, whether such memory rests upon the actual personal knowledge of the living, or upon historical or traditional knowledge.

Counsel for appellant invoke the guaranty of the first amendment to the constitution of the United States, which, so far as here necessary to notice its language, reads: "Congress shall make no law . . . abridging the freedom of speech, or of the press; . . ." One complete answer to this contention is that this amendment is, by its express language, only a limitation upon the power of Congress. Judge Cooley in his Constitutional Limitations (7th ed.), p. 46, observes:

"It is to be observed of this instrument, that being framed for the establishment of a national government, it is a settled rule of construction that the limitations it imposes upon the powers of government are in all cases to be understood as limitations upon the government of the Union only, except where the states are expressly mentioned."

So we are not here concerned with the question of the extent of freedom of speech or of the press in the light of this Federal constitutional amendment. Section 5, article 1 of our state constitution touching this subject reads:

"Every person may freely speak, write, and publish on all subjects, being responsible for the abuse of that right."

thus recognizing that this is not a guaranteed liberty wholly unrestrained by the law, which looks to the preservation of public peace and welfare. We are quite unable to appreciate an argument which suggests that any one has a constitutional right to maliciously defame the memory of a deceased person, though such person's memory lives only in history, any more than to maliciously defame a living person. We have no reference to historical criticism made in good faith in a temperate manner. "The law will always take into consideration the mind with which such publications are

made, and discriminate between the historian and the slan-
derer." Newell, Libel and Slander (2d ed.), p. 965.

Contention is made in appellant's behalf that the trial
court erred in denying his motion to dismiss the original
information filed against him and in granting the prosecut-
ing attorney's motion to file an amended information. Ap-
pellant's motion to dismiss was made upon the ground that
the information had not been verified as required by Rem.
Code, § 2051. As the original information appeared upon
its face not to have a certificate indorsed thereon showing
its verification, though it was signed by the prosecuting at-
torney, appellant's motion seemed to be well founded. There-
upon the prosecuting attorney immediately filed his motion
asking permission to file an amended information. The two
motions came on for hearing and were disposed of by the
trial court at the same time, resulting in an order denying
appellant's motion and in an order granting the prosecuting
attorney's motion. Thereupon the prosecuting attorney filed
an amended information in the exact language of the orig-
inal, which amended information was duly verified by him as
evidenced by certificate of the clerk of the court indorsed
thereon. This amended information is the one upon which
appellant was tried and convicted.

It is argued that the appellant was entitled to have the
original information dismissed and such dismissal treated as
a bar to his further prosecution of the particular offense
therein charged, because of the fact that the offense was only
a gross misdemeanor. Rem. Code, § 2101, by express terms,
entitles a defendant to have the information "set aside"
"when it is not verified." The word "dismiss" is not used
in this section, though its provisions are relied upon by
counsel for appellant as entitling him to dismissal in the
sense of an abandonment of the prosecution by the state,
rendering him thereafter immune from prosecution for the
offense as in the case of former jeopardy. We notice that
this section uses the words "set aside" and not "dismiss," as

an indication that the legislature did not intend that the setting aside of an information upon this ground should have the effect of a dismissal of the prosecution in the sense claimed by counsel. It would seem that the court did commit technical error in refusing to set aside the original information, assuming that appellant's motion was in substance a motion to set aside the information under § 2101. This, however, would be wholly without prejudice if the court was not in error in permitting the amended information to be filed. And this brings us to the real question in this branch of the case.

Counsel for appellant invoke the provisions of Rem. & Bal. Code, § 2125, reading as follows:

"An order for dismissal as provided in this chapter is a bar to another prosecution for the same offense, if it be a misdemeanor; but it is not a bar if the offense charged be a felony."

Now what is the "dismissal as provided in this chapter" as these words are used in § 2125? That section was § 777 of the code of 1881 and has remained unchanged to the present time. The dismissal so referred to is manifestly that dismissal which the statute designed to take the place of the *nolle prosequi* of the common law, as provided in the two preceding sections as follows:

"The court may, either upon its own motion or upon application of the prosecuting attorney, and in furtherance of justice, order an action, after an indictment or information, to be dismissed; but in such case the reason of the dismissal must be set forth in the order, which must be entered upon the record."

"The entry of a *nolle prosequi* is abolished, and no prosecuting attorney shall hereafter discontinue or abandon a prosecution except as provided in the last section."

Being §§ 775 and 776, Code of 1881, and §§ 2123 and 2124, Rem. & Bal. Code. Plainly the dismissal referred to in § 2124, Rem. & Bal. Code, being § 776, Code of 1881, has

no reference to the setting aside of the information provided for in § 2101, Rem. Code, touching the requisites of informations. If there was ever any doubt upon this question it is, in any event, set at rest by the following provisions of our criminal code of 1909:

"No order of dismissal or directed verdict of not guilty on the ground of a variance between the indictment or information and the proof, or on the ground of any defect in such indictment or information, shall bar another prosecution for the same offense." Rem. Code, § 2316.

We conclude that it is only those dismissals of misdemeanor prosecutions, made by the court upon its own motion or upon the motion of the prosecuting attorney, in such manner as to evidence an abandonment by the state of the prosecution of the defendant for the misdemeanor charged, and which take the place of the common law *nolle prosequi*, that render an accused immune from another prosecution for the same misdemeanor. Plainly the dismissal, or rather setting aside of the information, which appellant was here possibly technically entitled to, would not, even if granted, have rendered him so immune.

Finally, it is contended in appellant's behalf that the trial judge erred in excluding him from the court room and addressing the jury during the progress of his trial. A careful examination of the record before us convinces us that this did not occur; that is, that the trial judge did not address the jury in the absence of the appellant at any time while his trial was in progress. It is true that, upon one of the adjournments of the trial, the judge had occasion, as he conceived it to be his duty, to address all of the jurors in attendance upon the court, including those engaged in appellant's trial as well as others, touching a matter foreign to appellant's case; and that, upon the direction of the trial judge, all of the jurors so in attendance upon the court remained in the court room after all other persons had, by direction of the court, retired therefrom. The jurors en-

gaged in appellant's trial were not kept together during the adjournments of the court. Indeed, by the express provisions of Rem. & Bal. Code, § 346, it was the duty of the court to allow them to separate during the adjournments. We therefore have in effect the same situation as if the trial judge had met and conversed with the jurors at some other place than in the court room about a matter foreign to appellant's trial. No showing is here made that the judge's talk to the jurors had reference to appellant's trial. Indeed, what evidence there is in this record upon that subject all but conclusively proves to the contrary. It seems quite plain to us that the trial judge did not commit error as claimed in this respect.

We conclude that the record before us discloses no error prejudicial to appellant entitling him to a reversal of the judgment or to a new trial. We see no escape from the conclusion that the judgment must be affirmed. It is so ordered.

MORRIS, C. J., MOUNT, HOLCOMB, and FULLERTON, JJ., concur.